UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

CLAUDE AUCOIN                           CASE NO.  2:22-CV-01876

VERSUS                                  JUDGE JAMES D. CAIN, JR.

LIFEMAP ASSURANCE CO                    MAGISTRATE JUDGE KAY

<u>MEMORANDUM RULING</u>

Before the Court are Cross-motions for Judgment on the Employees' Retirement Income security Act of 1974 ("ERISA") Administrative Record (Docs. 18, 20) regarding Plaintiff Claude Aucoin's long-term disability insurance benefits under a group benefits plan issued by Defendant LifeMap Assurance Company ("LifeMap"). The motions are ripe.

## I.   <u>BACKGROUND</u>

Plaintiff worked for Greenberry Industrial, LLC ("Greenberry") as a project manager since June 6, 2016.[1] On August 31, 2019, Plaintiff hit the left side of his head on a piece of metal while vacuuming his truck at a car wash in New Orleans, Louisiana. Doc. 8-3, p. 148. Thereafter, 693 days later on July 24, 2021, Plaintiff stopped working for Greenberry, indicating that he suffered from traumatic brain injury ("TBI"), headaches with migraines, mild neurocognitive disorder due to TBI, tinnitus, imbalance, emotional lability, and insomnia.[2] Plaintiff attributes the aforesaid diagnoses to the August 31, 2019

---

[1] Doc. 8-3, p. 154.
[2] *Id.* at 154, 160–61.

accident, from which he claims caused his disability that rendered him unable to work as of July 20, 2021.[3]

## A. LifeMap Policy

Plaintiff worked for Greenberry Industrial, LLC ("Greenberry") and participated in the Group Long Term Disability Insurance Policy ("Policy") issued to Greenberry, which became effective October 1, 2011.[4] The Policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[5]

Plaintiff's Policy defines disability as

You are considered disabled when we review your claim and determine that, due to your sickness or injury:

1.  you are unable to perform all the material and substantial duties of your regular occupation; and

2.  you have a 20% or more loss in your monthly earnings.

. . .

The loss of a professional license or occupational license or certification does not, in itself, constitute disability.

You must be under the appropriate care of a doctor in order to be considered disabled.[6]

Injury is defined by the Policy as

a bodily injury that is the direct result of an accident and not related to any other cause. The injury must occur, and disability resulting from the injury must begin while you are covered under the policy. An injury that occurs before you are covered under the policy will be treated as a sickness.[7]

---

[3] Doc. 8-3, pp. 148, 160.
[4] Doc. 8-8, p. 624.
[5] *Id.*
[6] Doc. 8-5, p. 195.
[7] *Id.* at 186.

The Policy defines "Sickness" as "illness, disease or physical condition. Disability resulting from the sickness must begin while you are covered under the policy."

The Policy contains a limitation for mental illness, which states:

> The lifetime cumulative maximum period of payment for all disabilities due to mental illness is 24 months. Only 24 months of benefits will be paid even if the disabilities:
>
> 1. are not continuous; and/or
> 2. are not related.[8]

The Policy defines "Mental Illness" as

> a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders; or disorders related to stress or to substance abuse or dependency. If the DSM is discontinued or replaced, these disorders will be those classified in the diagnostic manual then used by the American Psychiatric Association as of the start of a disability.
>
> . . .
>
> We will not make payments beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.[9]

### B. Plaintiff's Claim for Benefits under the Policy

On August 9, 2021, Plaintiff submitted a short-term disability claim ("STD") to LifeMap for a disability that began on July 24, 2021, however, caused by an August 31, 2019 accident.[10] The accident involved Plaintiff hitting his head on a piece of metal while vacuuming his truck.[11] Plaintiff's August 3, 2021 Statement of Short Term Disability

---

[8] *Id.* at 210.
[9] *Id.*
[10] Doc. 8-8, p. 578.
[11] *Id.* at 660.

indicated that his symptoms first appeared on the date of the accident, and include headache with migraine, tinnitus, imbalance, memory loss, anxiety, depression, and insomnia.[12] Plaintiff's treading physician, Dr. David Wier, indicated that the August 31, 2019 accident causes Plaintiff to suffer from chronic brain injury, post-traumatic headache with migraine due to traumatic brain injury ("TBI"), neurocognitive impairment, tinnitus, imbalance, and emotional lability.[13] On October 7, 2021, Plaintiff's STD Claim was approved, he was awarded benefits from July 31, 2021 to October 15, 2021.[14] Thereafter, his claim file was forwarded for long-term disability ("LTD") consideration.[15] On November 23, 2021, LifeMap determined that no long term disability benefits were payable for the following reasons:

> The findings of intact function are consisting with the circumstances of your stated impairment. It does not support any significant head injury occurred at the onset of your impairment, and that the claim of disability has been based on self-reported symptoms alone. There was no evidence of loss of consciousness, no interior grade amnesia, no retrograde amnesia, no medical attention at the accident, no clear findings of the injury on the MRI, no clear findings on pathology on the electroencephalogram, you continued to work post-injury, and there are psychological signs of Somatic Symptoms Disorder.[16]

Thereafter, Plaintiff appealed LifeMap's decision, and, on May 26, 2022, LifeMap notified Plaintiff's counsel that it was upholding its previous determination that he did not qualify for LTD benefits.[17] On June 24, 2022, Plaintiff filed suit against LifeMap.[18]

---

[12] *Id.* at 600.
[13] *Id.* at 1–5.
[14] *Id.* at 744.
[15] *Id.*
[16] *Id.* at 1–5.
[17] Doc. 18-1, p. 18.
[18] Doc. 1.

Plaintiff now moves the Court to render judgment in his favor, finding he is disabled as defined by the Policy. LifeMap moves the court to affirm its decision.

## II.  <u>STANDARD OF REVIEW</u>

Plaintiff's claim is governed by ERISA. The parties agree and the Court finds that de novo standard of review applies. A district court's review is limited to the administrative record. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999). Moreover, "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Id.* at 300 (5th Cir. 1999) (en banc), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008). Thus, evidence dated or generated after a claimant files suit in federal court is excluded. *Wittmann v. Unum Life Ins. Co. of Am.*, No. CV 17-9501, 2018 WL 5631421, at *7 (E.D. La. Oct. 31, 2018). Accordingly, the Court will not consider any evidence after June 24, 2022, the date this lawsuit was filed.

"Standard summary judgment rules control in ERISA cases." *E.g.*, *Miller v. Reliance Standard Life Ins. Co.*, 999 F.3d 280, 282 (5th Cir. 2021) (internal quotations omitted). Moreover, "[w]hen parties file cross-motions for summary judgment, [courts] view[] the evidence and inferences in the light most favorable to the nonmoving party." *Id.* Accordingly, Plaintiff must prove by a preponderance of the evidence that he is disabled under his plan.

# III. <u>ANALYSIS</u>

Under de novo review of Plaintiff's claim for LTD benefits, the Court determines whether the Plaintiff is entitled to benefits under the plan based on the evidence in the administrative record. The Supreme Court has held that the "Treating Physician Rule" does not apply to private benefit plans; thus, the decisionmaker is neither required "to accord special weight to the opinions of a claimant's physician nor . . . expla[in] when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Ultimately, Plaintiff must demonstrate that he is "unable to perform all the material and substantial duties of his regular occupation."[19]

## A. The Court's Findings From The Administrative Record

After the August 31, 2019 accident, Plaintiff, while at work, went to the clinic and was sent him home after he reported having high blood pressure, headaches, dizziness, and blurred vision.[20] On September 3, 2019, Plaintiff visited primary care physician Dr. Kevin T. Schlamp, M.D. with Schlamp Family Medical Clinic.[21] Dr. Schlamp's note indicates that Plaintiff had a history of anxiety but was not on any medications.[22] Plaintiff's blood pressure was taken at 140/96, his height and weight recorded at 5'10"/245 lbs., which is a BMI of 35.12.[23] The visit's note indicates that his BMI is outside of parameters.[24] According to the Centers for Disease Control and Prevention, at the time of Plaintiff's visit,

---

[19] Doc. 8-5, p. 195.
[20] Doc. 8-3, p. 209 (The record indicates that Plaintiff's reported blood pressure at work was 176/118.).
[21] *Id.*
[22] *Id.* at 207.
[23] *Id.* at 210.
[24] *Id.*

a BMI of 35.12 places him in the Obesity category for adults, which increases risk factors for high blood pressure, sleep apnea, anxiety, and depression.[25] Dr. Schlamp diagnosed Plaintiff with a mild concussion, placed him off work, ordered him to monitor his blood pressure, and prescribed three 325mg hydrocodone tablets per day for five days.[26]

On September 6, 2019, Plaintiff is referred by attorney Yui Lorio to the Ryder Clinic, 6555 Perkins Rd., Suite 200, Baton Rouge, La, for a "PCS[27] evaluation."[28] Plaintiff's visit was connected with a personal injury.[29] Plaintiff reported constant pain that interferes with his work, sleep, and daily routine.[30]

On September 20, 2019, Plaintiff visited Southwest Louisiana Imaging, 1601 Country Club Rd., Lake Charles, Louisiana, for an MRI of the brain, which showed no acute intracranial process.[31]

On October 3, 2019, Plaintiff was referred by attorney Yui Lorio to Dr. David Weir with Neurologic Specialty Consulting Services, LLC, who noted that the Plaintiff did not lose consciousness following the August 31, 2019 accident, and was able to drive himself home from New Orleans to Sulphur, Louisiana.[32] At the time of the exam, Plaintiff was 53 years old, 5'10", 255 lbs., with 140/98 blood pressure.[33] Dr. Weir noted that Plaintiff complains of daily headaches, lasting from a few minutes to several hours. Plaintiff stated

---

[25] https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.htm; https://www.cdc.gov/obesity/basics/consequences.html.
[26] Doc. 8-3, p. 211.
[27] Post-concussion syndrome.
[28] Doc. 8-3, p. 524 (Plaintiff's blood pressure at visit was 144/97.).
[29] *Id.* at 521.
[30] *Id.* at 524.
[31] *Id.* at 264–65.
[32] *Id.* at 512.
[33] *Id.* at 514.

to Dr. Weir that the brief headaches are very sharp; he feels like he is being stabbed in the temple.[34] Plaintiff reported to Dr. Weir a history of five previous concussions.[35] Additionally, Plaintiff reported dizziness, imbalance, blurred vision, memory loss, hearing muffed sounds, taste impairment, emotional lability, anxiety, difficulty with patience, nausea, hand tremors, episodic confusion, and high blood pressure.[36] Dr. Weir ordered an MRI and EEG[37] to determine if his August 31, 2019 concussion caused any traumatic brain injury, referred him to neuropsychological evaluation and cognitive therapy/retraining, prescribed Zonegran 100mg, Zofran 8mg, Melatonin 10mg, and Diclofenac sodium 50mg with Sumatriptan 100mg.[38]

On October 31, 2019, Plaintiff underwent an EEG and the results were negative.[39] Then on November 11, 2019, Plaintiff underwent another MRI, this time at Lourdes Imaging St. Mary's, 411 St. Landry St., Lafayette, Louisiana, which indicated punctate foci of white matter signal abnormality in the right frontal lobe which are nonspecific.[40] Additionally, the imaging showed subtle loss of fractional anisotropy in the posterior body of the corpus callosum raising the question of injury, however, no intracranial abnormality.[41]

---

[34] *Id.* at 512.
[35] *Id.* at 513.
[36] *Id.*
[37] Electroencephalogram.
[38] Doc. 8-3, pp. 514–15.
[39] *Id.* at 566.
[40] *Id.* at 577.
[41] *Id.* at 577–78.

On December 4, 2019, Plaintiff was seen by Dr. Weir for a follow up.[42] Plaintiff continued to report daily headaches occurring from 30 minutes to six hours. Dr. Weir increased his Zonegran dosage to 300mg, prepared him for Botox injections, started him on Melatonin 10mg, and Relpax 40mg.[43]

On September 8, 2020, Plaintiff was seen by Dr. Mark Warner, Ph.D., neuropsychologist, who conducted a neuropsychological evaluation and diagnosed Plaintiff with mild neurocognitive disorder due to traumatic brain injury, psychological factors (mood, lability, insomnia, irritability) affecting other medical conditions (chronic, headache, neck pain), adjustment disorder with mixed disturbance of emotions and conduct, and current functioning that is mild to moderately impaired.[44]

On October 22, 2020, Plaintiff is seen by Dr. Schlamp, who notes that Plaintiff is morbidly obese with a BMI of 38.16.[45] Additionally, Plaintiff was assessed has having hypertension, gastro-esophageal reflux disease with esophagitis, pleurisy, hypothyroidism, and acute sinusitis.[46] Plaintiff's blood pressure was 138/80.[47] As of this visit Plaintiff's medications include the following: Alprazolam, Diltiazem HCL, Hydrocodone, Levothyroxine, Naproxen, Cefdinir, Medrol, and Tramadol.[48]

On March 8, 2021, Plaintiff visited Dr. Schlamp for a positive COVID-19 test.[49] Plaintiff's chief complaints are chills, fatigue, fever, loss of appetite, diarrhea, back aches,

---

[42] *Id.* at 507.
[43] *Id.* at 508.
[44] *Id.* at 574.
[45] *Id.* at 238.
[46] *Id.*
[47] *Id.* at 237.
[48] *Id.* at 236–38.
[49] *Id.* at 246.

weakness, sore throat, drainage, stuffy ears, runny nose, nausea, abdominal pains, dizziness, head injury, headaches, tingling, anxiety, and being stressed.[50] At the time of the visit, Plaintiff's current medications include Albuterol Sulfate, Alprazolam, Diltiazem HCL, Doxycycline Monohydrate, Hydrocodone, Levothyroxine, Medrol, Naproxen, and Tramadol.[51]

On April 5, 2021, Plaintiff visited Dr. Schlamp for post-COVID follow up after testing negative for two weeks and three days.[52] Plaintiff complained of fatigue, stuffy ears, runny nose, drainage, cough, nausea, muscle pain and stiffness, but no psychological symptoms are reported.[53] Plaintiff's blood pressure is 130/86 and reports taking Doxycycline Monohydrate and Levothyroxine.

On May 18, 2021, Plaintiff is seen by Dr. Schlamp for a wellness visit and reported no complaints.[54] At the time of the visit, Plaintiff's blood pressure is 132/68, his BMI at 34.89, and reports not taking any medications.

On June 7 and 8, 2021, Plaintiff was seen by Dr. Susan Andrews and underwent a neuropsychological evaluation.[55] On July 20, 2021, Dr. Andrews's report indicated that Plaintiff had shown excellent recovery from his September 8, 2020 neuropsychological evaluation performed by Dr. Mark Warner.[56] Dr. Andrews noted that Plaintiff is functioning within the Very Superior range, with a Wechsler Adult Intelligence Scale –

---

[50] *Id.*
[51] *Id.*
[52] *Id.* at 248.
[53] *Id.* at 249.
[54] *Id.* at 252.
[55] *Id.* at 21.
[56] *Id.*

Fourth Edition (WAIS-IV) Full Scale IQ (FSIQ) score of 133 (99th percentile).[57] Dr. Andrews noted that notwithstanding Plaintiff's reported previous five concussions, his scores and recovery are remarkable.[58] Dr. Andrews stated that Plaintiff satisfied diagnoses of postconcussional syndrome, adjustment disorder with mixed anxiety and depression, and that a diagnoses of Somatic Symptom Disorder with Predominant Pain ("SSD") was appropriate.[59] In all, Dr. Andrews recommended that Plaintiff remain active by maintaining gainful employment if possible.[60]

On July 20, 2021, Plaintiff is seen by Dr. Weir and reports that his tinnitus and anxiety are more troublesome to him than his headaches.[61] Dr. Weir continued Plaintiff on Aimovig 140mg, Nurtec ODT 75mg, Meclizine 25mg, and referred him to Dr. Patrick Hayes for progressing emotional lability with anxiety and depression.[62]

On August 3, 2021, Dr. Weir stated that he recommended that Plaintiff stop working on October 3, 2019.[63] There, however, is no contemporaneous record of this recommendation in Dr. Weirs notes from October 3, 2019. The only record from Dr. Weir's office that indicates Plaintiff is unable to work is from the July 20, 2021 visit, which is three days prior to Plaintiff's last day of work on July 23, 2021.[64]

---

[57] *Id.* at 15.
[58] *Id.* at 21.
[59] *Id.*
[60] *Id.*
[61] *Id.* at 477.
[62] *Id.* at 478.
[63] *Id.* at 160.
[64] *Id.* at 479.

On August 4, 2021, Plaintiff is seen by Dr. Schlamp, M.D., whose notes indicate that Plaintiff's blood pressure is 124/88, for which he is currently taking Diltiazem.[65] At the time of the visit, Plaintiff's BMI is 35.43.[66] Dr. Schlamp notes that Plaintiff is concerned about his mental state since having the concussions.[67] Dr. Schlamp's notes do not indicate that Plaintiff has concerns about tinnitus.[68]

On November 21, 2021, Dr. Malcom Spica, Ph.D., neuropsychologist, Spica Psychology, PLLC, 200 Fort Sanders West Blvd., Building 1, Suite 102, Knoxville, Tennessee, reviewed Plaintiff's medical information that was submitted to LifeMap.[69] Dr. Spica stated that Plaintiff's medical documentation does not provide evidence of neurocognitive or behavioral health dysfunction that rises to the level of impairment.[70] Dr. Spica noted that the evidence may provide some marginal, inconsistent support for Plaintiff's asserted diagnoses, the evidence indicates that he is functioning adequately despite his claimed conditions.[71] Dr. Spica's review of Dr. Andrew's June 2021 neuropsychological examination highlighted the fact that depression or anxiety were not evident on the standardized measure in Personality Assessment Inventory.[72] Dr. Spica, however, indicated that the June 2021 examination detected personality disorders such as Somatization Disorder (>99th percentile), Dominance (97th percentile), and Mania (96th

---

[65] *Id.* at 205, 207.
[66] *Id.* at 205.
[67] *Id.*
[68] *Id.* at 205-08.
[69] Doc, 8-4, p. 480.
[70] *Id.*
[71] *Id.*
[72] *Id.* at 482.

percentile).[73] Specifically, the SSD with Predominant Pain that he was diagnosed with by Dr. Andrews, explains why he attributes the experience of his symptoms to "brain injury."[74] Dr. Spica stated that "[t]his condition places the [Plaintiff] at risk for over-focusing on perceived minor ailments, rumination, and misattributing subjective difficulties as being due to a medical condition."[75] Dr. Spica also stated his impression of Plaintiff's "overall patter of improvement" from his September 2020 neuropsychological examination to his June 2021 neuropsychological examination indicated that his "performance increases [were] due to non-neurologic factors, such as emotional adjustment."[76] Dr. Spica further stated that Plaintiff's only areas of weakness "appeared variable rather than representing a persisting impairment (as would be expected from neurologic injury)," which would not preclude him from his occupational functioning.[77] In all, Dr. Spica found that Plaintiff's performance on his neuropsychological examination was not consistent with a debilitating neurocognitive disorder.

On January 10, 2022, Plaintiff spoke with a LifeMap representative by phone and indicated that his tinnitus precluded him from working; he explained his condition "as being totally drunk all of the sudden with dizziness and bumping into walls" despite previously stating that he did not drink alcohol.[78]

---

[73] *Id.*
[74] *Id.* at 482–83.
[75] *Id.* at 483.
[76] *Id.*
[77] *Id.*
[78] Doc. 8-3, p. 553; Doc. 8-4, p. 346.

On February 7, 2022, Dr. Wesley Johnson, M.D., reviewed Plaintiff's medical records and determined that they did not support the presence of a physical or behavioral health condition that would preclude the claimant from his own occupational demands.[79] Dr. Johnson noted that Plaintiff's "[p]rimary care records from 2018 indicate a medical history of anxiety, back pain, obesity, bronchitis, and prior pneumonia."[80] Dr. Johnson's review found that Plaintiff worked full-time and at full capacity after his August 31, 2019 injury until July 24, 2021.[81] Additionally, Dr. Johnson found that Plaintiff was seen by Dr. Weir following the August 31, 2019 accident on October 3, 2019, December 4, 2019, February 13, 2020, then a lapse of 476 days or 1.3 years on June 3, 2021, July 20, 2021, and September 21, 2021.[82] Dr. Johnson found that Plaintiff received additional care for tinnitus from Dr. Nileshwar, psychotherapy consultation from Mr. Walker, and counselling with Ms. Dowden.[83] Plaintiff's last note from Dr. Schlamp on November 30, 2021, indicated that he continued to experience headaches, migraines, tinnitus, insomnia, joint pain, fatigue, and anxiety, for which Alprazolam was continued.[84] From these records no work capacity opinion or restrictions/limitations had been provided by Dr. Schlamp, Dr. Nileshwar, Mr. Walker, or Ms. Dowden.[85] Dr. Johnson concludes the following regarding Plaintiff's medical records: Plaintiff's reporting of headaches is inconsistent in his medical file; he has not pursued in-ear masking devices for tinnitus; there is no evidence that his

---

[79] Doc. 8-3, p. 586.
[80] *Id.* at 584.
[81] *Id.* at 582.
[82] *Id.* at 582–83.
[83] *Id.* at 584.
[84] *Id.*
[85] *Id.*

hearing impairment would be disabling; he has denied medication approaches for behavioral health conditions of anxiety and panic except for Alprazolam, from which no providers opine impairment; there are no medical records regarding acute COVID-19 treatment or its severity; and no medical providers opine that Plaintiff's headaches, tinnitus, or cognitive complaints are related to his COVID-19 illness.[86]

On March 24, 2022, Plaintiff is seen by Dr. Charles Anzalone, M.D., otolaryngologist, Acadian ENT & Facial Plastic Surgery Center, who performed an otolaryngologic exam.[87] Plaintiff was referred to Dr. Anzalone by Dr. Weir.[88] Dr. Anzalone's note indicates that Plaintiff's chief complaint is "tinnitus located in both ears, left worse than right. . . . He has tinnitus that is locust sounding and high pitched. . . . The tinnitus has been present for two years."[89] The audiogram showed bilateral high frequency sensorineural hearing loss.[90] Dr. Anzalone discussed the following considerations with Plaintiff concerning his tinnitus: hearing aids with tinnitus suppressive component; sleep treatment options; weight loss; and pharmacological therapy to treat his anxiety and depression such as an SSRI.[91]

On April 12, 2022, Plaintiff is seen by Dr. Ram Nileshwar Au.D., CCC-A, FAAA to discuss hearing aid options.[92] Plaintiff was provided with a trial set of hearing aids and

---

[86] *Id.* at 584–85.
[87] Doc. 8-5, p. 849–51.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.* at 850–51.
[92] *Id.* at 900.

"[h]is immediate response was one of great amazement as to how much better he was hearing."[93]

### B. The Administrative Record Does Not Support Long-Term Disability

LifeMap argues that the only treating physician to opine that Plaintiff was precluded from performing his occupational duties was his treating neurologist, Dr. David Weir.[94] On the other hand, Plaintiff argues that the opinions of Plaintiff's treating providers prove by a preponderance of the evidence that he was disabled from his occupation as a project manager.[95]

In the Court's review of the administrative record, the only doctor who opined that Plaintiff was incapable from performing his occupation due to an impairment was Dr. Weir. To this, LifeMap points to the January 20, 2022 correspondence from Dr. Johnson to Dr. Weir, which asks Dr. Weir why Plaintiff's inability to work was delayed until July 2021 for an accident that occurred in August 2019.[96] Dr. Weir's written response states that Plaintiff

> [h]as prolonged persistent post-concussion symptoms, post traumatic daily headaches that transform to migraines and have been intractable to all forms of treatment causing him to score a 65 on Head Impact testing and an Impairment Rating based on MIDAS testing as per the AMA Guide of Permanent Impairment, 6th Edition of Class 4 with 5% whole person Disability, sever Disability based on severity of his headaches. He also has tinnitus and is awaiting an evaluation for tinnitus/dizziness by a neuro-otologist.[97]

---

[93] *Id.*
[94] Doc. 18-1, p. 24.
[95] Doc. 24, pp. 1–3; doc. 20, p. 37.
[96] Doc. 8-3, p. 588.
[97] *Id.*

Notwithstanding Dr. Weir's statements, Plaintiff's complaints of intractable headaches are inconsistent within the administrative record. For example, Dr. Weir did not see Plaintiff for 476 days or 1.3 years from February 13, 2020, to June 3, 2021, a period that Plaintiff allegedly was suffering from prolonged persistent post-concussion symptoms, including intractable post traumatic daily headaches that transform to migraines. During this period, on May 1, 2020, Plaintiff indicated to his primary care physician, Dr. Schlamp, that his "headaches had been [a] little better but now with more stress [he was] having them again [and] relpax has helped his headaches."[98] Then on June 13, 2020, Plaintiff is seen by Dr. Schlamp and indicates that "he is noticing his BP is going up as his headache gets worse."[99] On July 25, 2020, Dr. Schlamp's note does not indicate that Plaintiff complained about headaches but rather back pain.[100] On September 28, 2020, Plaintiff saw Dr. Schlamp for complaints about chest pain and indicated that his headaches were better until he experienced chest pain.[101] Then on May 18, 2021, Plaintiff reports to Dr. Schlamp no complaints whatsoever, *e.g.*, no headaches, no anxiety, and no tinnitus.[102] Just two months later, on July 21, 2021, Plaintiff reports to Dr. Weir that his "tinnitus and anxiety are more troublesome to him than his headaches, which are daily."[103] That same visit, Dr. Weir has Plaintiff complete a questionnaire known as the Headache Impact Test (HIT6), which his score is 65, thus indicating that his headaches are having a very severe impact on his life.[104]

---

[98] *Id.* at 220.
[99] *Id.* at 224.
[100] *Id.* at 227.
[101] *Id.* at 230.
[102] *Id.* at 252.
[103] *Id.* at 477.
[104] *Id.* at 554–55.

In addition to the inconsistencies in Plaintiff's complaints of headaches, his reported complaints of tinnitus exhibit a similar pattern. Dr. Schlamp's notes accompanying Plaintiff's visits do not indicate complaints of tinnitus for the following dates: September 3 and 10, 2019, March 10, 2020, May 2, 2020, June 13, 2020, July 25, 2020, September 28, 2020, October 19, 22, and 26, 2020, October 20, 2020, March 8, 2021, April 5, 2021, May 18, 2021, July 6, 2021, August 4, 2021.[105] But Dr. Weir's note from Plaintiff's October 3, 2019 visit indicate that "he is hearing muffled sounds" and a constant bilateral static sound.[106] Then on July 20, 2021, Dr. Wier's note indicates that Plaintiff's anxiety is increasing daily, which is "contributed to by his tinnitus that protensively worsening."[107] However, when Plaintiff visits Dr. Nileshwar on April 12, 2022, he expresses amazement on how much better he is hearing.

The above-mentioned inconsistencies in Plaintiff's complaints can likely be reconciled by his diagnosis of SSD following a rigorous neuropsychological evaluation on June 7 and 8, 2021, by Dr. Susan Andrews. According to the Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H9 ("DSM-5"), the diagnostic criteria for SSD are as follows:

> A. One or more somatic symptoms that are distressing or result in significant disruption of daily life.
>
> B. Excessive thoughts, feelings, or behaviors related to the somatic symptoms or associated health concerns as manifested by at least one of the following:

---

[105] *Id.* at 205–60.
[106] *Id.* at 513.
[107] *Id.* at 477.

1. Disproportionate and persistent thoughts about the seriousness of one's symptoms.

2. Persistently high level of anxiety about health or symptoms.

3. Excessive time and energy devoted to these symptoms or health concerns.

C. Although any one somatic symptom may not be continuously present, the state of being symptomatic is persistent (typically more than 6 months).

*Specify* if:

With predominant pain (previously pain disorder): This specifier is for individuals whose somatic symptoms predominantly involve pain.

Pertaining to Plaintiff's SSD diagnosis, Dr. Weir, Plaintiff's sole treating physician asserting he is unable to perform his occupation as a Plant Manager, fails to opine on how his SSD interplays with his overall alleged impairment stemming from the August 31, 2019 accident. Relatedly, when specifically asked to provide his rationale as to why Plaintiff's inability to work arose 693 days after his August 31, 2019 accident on July 24, 2021, Dr. Weir issued a non-responsive answer pointing to Plaintiff's HIT6 score of 65, which is based on a questionnaire that Plaintiff completed on July 21, 2021. Furthermore, Plaintiff's self-reported condition to Dr. Weir on July 21, 2021, follows a visit by Plaintiff to Dr. Schlamp just two months earlier on May 18, 2021, whereby Plaintiff indicated that he had no complaints at all. Though Dr. Weir certifies that Plaintiff is impaired and unable to work due to prolonged post-concussion symptoms, the weight given to his opinion is lessened by his inability to explain why Plaintiff continued to work for 693 days following his concussive accident.

Plaintiff's gap in treatment with Dr. Weir also belies Dr. Weir's opinion that Plaintiff's post-concussion symptoms prevent him from working. After Plaintiff's initial consult with Dr. Weir in October 2019 that followed a referral by his attorney Yui Lorio, Plaintiff saw Dr. Weir in December 2019 and on February 13, 2020, but then not again for 476 days or 1.3 years until June 3, 2021. Notably, this gap in treatment history with the treating physician who is opining that Plaintiff is impaired to the extent he is unable to perform his occupation as a Project Manager coincides with a period of time where the Plaintiff continued to perform his occupation as a Project Manager. Considering Plaintiff continued to work, his decision to stop working due to TBI on July 24, 2021, and the causal event of the TBI, the August 31, 2019 accident, are too attenuated to warrant a finding of impairment absent some justification. To this, Plaintiff argues that the contradiction between Plaintiff's delayed yet abrupt inability to work and the causal incident is best explained as that "[t]here just came a time when he finally gave in."[108] But despite Plaintiff's argument that his condition was progressively worsening, the objective data within the administrative record prove otherwise. For example, Dr. Andrews's July 20, 2021 report shows that Plaintiff was exhibiting an excellent recovery from his September 8, 2020 neuropsychological evaluation, he possessed a 99th percentile IQ of 133, and she recommended that he continue working.[109] Plaintiff's two MRIs in September and November 2019 did not conclude that the August 31, 2019 accident, involving his left temple area, caused any intracranial abnormality. Additionally, in March 2022, Plaintiff

---

[108] Doc. 26, p. 1.
[109] Doc. 8-3, p. 15.

reported to Dr. Anzalone that his tinnitus had been present for two years; however, during that time he saw Dr. Schlamp on 14 different occasions and reported no complaints about tinnitus or his hearing.[110]

In all, the Court finds that Plaintiff has not met his burden to prove by a preponderance of the evidence that he is unable to perform all the material and substantial duties of a Plant Manager. While the Court recognizes that Plaintiff's subjective complaints indicate that he can no longer work and his condition is progressively worsening, the administrative record as a whole, however, does not support such a finding. The objective data in the record indicate that his physical condition related to the August 31, 2019 accident has markedly improved. Furthermore, no doctor he has seen has recommended that his behavioral health issues/diagnoses rise to the level of impairment. Specifically, his treating physician recommending impairment, Dr. Weir, has not opined on his diagnosis of SSD, which may explain many of the contradictions in Plaintiff's reported symptoms.

## IV.   CONCLUSION

For the aforementioned reasons, that LifeMap's Motion for Judgment on the ERISA Administrative Record (Doc. 18) will be **GRANTED**, and Plaintiff's motion (Doc. 20) on the same will be **DENIED**.

**THUS DONE AND SIGNED** in Chambers on this 8th day of September 2023.



**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[110] *Id.* at 205–60.